UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

STEPHEN M. DEANE,

                Plaintiff,

                v.                             CAUSE NO.: 3:19-CV-153-PPS-MGG

RON NEAL, et al.,

                Defendants.

OPINION AND ORDER

Stephen M. Deane, a prisoner without a lawyer, has a serious and persistent

wound on his foot that causes him great pain and an inability to walk on occasion. He

has repeatedly sought medical care at the prison that houses him.  He believes that the

care that he has received is so bad as to be unconstitutional and so he has brought this

action under 42 U.S.C. § 1983 alleging a violation of the Eighth Amendment. (ECF 4.)

He was granted leave to proceed on three claims: a claim for monetary damages against

Drs. Joseph Thompson and Nancy Marthakis for deliberate indifference to his medical

needs, and a claim for injunctive relief against Ron Neal, the Warden of Indiana State

Prison ("ISP"), related to his ongoing need for medical care for his foot problem. (ECF

11.) Dr. Marthakis and Warden Neal seek summary judgment arguing that the

undisputed facts show Dr. Marthakis was not deliberately indifferent to Mr. Deane's

medical needs. (ECF 140, 143.) I disagree. There are an abundance of fact questions that

a jury must resolve, so the motions for summary judgment will be denied.

## Factual Background

Dr. Nancy Marthakis is a physician licensed to practice medicine in the State of Indiana. (ECF 141-2 ¶ 1.) Since January 10, 2018, she has been employed by Wexford of Indiana, LLC as the Medical Director at ISP. (*Id.* ¶ 2.) As the Medical Director, she provides clinical services and evaluates patients that are placed on her schedule. (*Id.* ¶ 3). Mr. Deane is a 67-year-old man who has been in the custody of the Indiana Department of Correction for more than two decades. (ECF 141-3 at 13.) He has a host of medical issues but the one that is at issue presently is the recurring wound on his left foot. (ECF 141-2 ¶ 5; ECF 141-4 at 1.) What follows is an exhausting recitation of the history of Mr. Deane's foot problems and the attempts by prison officials to deal with them. While the following description is lengthy, it is necessary to put in context the legal issues presented by this case.

In early 2018, Mr. Deane was seen for a "chronic care" visit by Diane Thews, a nurse practitioner at ISP. (ECF 141-2 ¶ 6.) She ordered an x-ray of his foot, which revealed degenerative changes to the left foot and a Varus deformity with no acute bony abnormality. (*Id.*) A Varus deformity is an abnormal inward angulation of a segment of bone or joint. (*Id.* ¶ 7.) Mr. Deane's x-ray confirmed abnormal curvature of his left foot. (*Id.*) In Dr. Marthakis's view, this condition "did not present any acute injury, fracture, or significant abnormality." (*Id.*)

On July 13, 2018, Dr. Marthakis saw Mr. Deane for a chronic care visit for treatment of his medical conditions. (ECF 141-4 at 24.) During this visit, Mr. Deane reported a persistent callous to the left lateral foot area at the base of his fifth metatarsal.

(*Id.*) Dr. Marthakis' examination noted a callous on his left foot and a "dropped metatarsal head to 5th digit." (*Id.* at 26.) She ordered Tylenol for one month and told him "he can obtain gel insoles from commissary and gym shoes" if his present shoes were causing him pain. (*Id.*) She ordered three additional x-rays. (*Id.*) She also renewed his medical permit to be housed on the 200 level or below to minimize the number of stairs he had to climb. (ECF 141-3 at 63.) In her opinion, Mr. Deane did not have a need for any immediate treatment for the callous. (ECF 141-2 ¶ 8.) Mr. Deane was not able to buy gel insoles or gym shoes from the commissary because he is indigent.[1] (ECF 141-3 at 43, 57.)

Two weeks later, Mr. Deane was seen by a nurse during "sick call" with increased redness and swelling to the calloused area. (ECF 141-4 at 27.) He told the nurse, "See it has gotten bigger with large blotches." (*Id.*) The nurse noted "increased warmth, increased redness, increased swelling, [and] increased pain" in the left leg. (*Id.* at 28.) She further noted, "It is not clear when he had the callous removed on the small toe nor how many events of this he has had." (*Id.*) Dr. Marthakis gave a verbal order for the antibiotic Bactrim, as well as the steroid Prednisone. (*Id.*)

On October 25, 2018, Mr. Deane was seen by Nurse Practitioner Thews and reported a "persistent callous . . . which is causing pain." (ECF 141-4 at 29.) Her examination revealed a "callous with open area in center, . . . warmth, light yellow

---

[1] At his deposition, Mr. Deane testified that another inmate bought him a pair of gym shoes sometime in 2018 because, in his words, "I couldn't wear shoes the wound was so bad." Those shoes have since "worn out." (ECF 141-3 at 43-44.)

drainage & red streaking into foot." (*Id.* at 30.) She further noted "tenderness over 5th

metatarsal & lateral L foot." (*Id.*) She prescribed the antibiotic Augmentin and provided

him an antibiotic injection of Rocephin. (*Id.*) She ordered an additional x-ray and

referred him for regular "wound care." (*Id.*) ISP has a nurse that is specifically trained

on the management of wounds. (ECF 141-2 ¶ 11.) When a patient is referred for wound

care, they are put on a count sheet and will be consistently followed, sometimes daily,

by this nurse. (*Id.*)

On October 26, 2018, an x-ray of Mr. Deane's foot revealed a "tailor's bunion"

with degenerative changes of the foot with the previously noted Varus deformity. (*Id.*

¶ 12.) A tailor's bunion is a bony or hard lump that forms along the side of the little toe

and is usually caused by an enlargement or shift of the fifth metatarsal. (*Id.* ¶ 13.) In

some cases, a tailor's bunion will cause no symptoms, but in other cases symptoms may

occur, most often from irritation on the area of the bunion. (*Id.*) Shoe modifications,

padding, icing, or orthotic modifications can be used to treat symptoms related to a

tailor's bunion. (*Id.*)

On October 31, 2018, Mr. Deane was seen by the nurse and reported that "the

bunion on his 5th metatarsal has been there and calloused for several years without

causing pain or drainage until 4 years ago when site began to swell with fluid filled

pocket and eventually burst open draining bloody and clear fluid." (ECF 141-4 at 34.)

He further reported that the "site has swollen with fluid and burst open at least 4 times

in last four years" and that he had "been placed on antibiotics at least four times due to

infection associated with the wound site." (*Id.*) The nurse did not note any current signs

of infection. (*Id.*) She changed the dressing on the wound and he returned to his housing unit. (*Id.*)

On November 2, 2018, Mr. Deane was seen again by the nurse for wound care. (*Id.* at 36.) She noted that she had discussed with the doctor placing Mr. Deane "on non-weight bearing status . . . to alleviate access pressure to wound site." (*Id.*) He was seen again for wound care on November 3, 2018 and was "provided supplies" and "education . . . on rest, elevation," and was told to "stay off foot as much as possible." (*Id.* at 39.) On November 4, 2018, he was seen by the nurse and reported that he did not believe the problem with his foot was "being taken care of properly." (*Id.* at 40.) She changed his bandages but did not note any other concerns. (*Id.* at 41.)

The following day, he was seen again by the nurse, who reported an "open site . . . atop boilers bunion approximately 2 cm x 2 cm x .02cm with moderate amount serosanguinous drainage from site and soft center to wound bed." (*Id.* at 42.) He reported to her that he was currently wearing "12.5EEEE shoes" and that they were still "rub[bing] [the] wound site causing irritation, pain and occasionally redness." (*Id.*) The nurse updated Dr. Marthakis on the status of the wound, and she told the nurse to provide Mr. Deane with crutches so that he could "remain non-weight bearing to L foot in order to try and off load pressure" for a two-week period. (*Id.* at 43.) He was given a "lay in" pass so that he did not have to report to his prison work assignment but was told he would still have to go the cafeteria to get his meals. (*Id.*) He was observed leaving the unit on crutches in compliance with the doctor's orders. (*Id.*)

He was seen the following day for wound care and the nurse noted a "moderate" amount of drainage at the wound site. (*Id.* at 44.) The following day, the nurse noted that the wound appeared to be "healing well." (*Id.* at 45.) She noted that Mr. Deane was using his crutches in compliance with the doctor's orders. (*Id.*) He was seen again on November 6, 2018, and November 7, 2018, and the nurse noted that he was still using the crutches. (*Id.* at 46-47.) On November 7, 2018, the nurse noted some drainage at the wound site, but noted that the wound was decreasing in size. (*Id.* at 48.) During this visit, Mr. Deane expressed concerns to her about his foot. (*Id.* at 50.) He told her that the wound had been a recurring problem for four years and during certain periods his foot had turned "red and purple in color from my shin to my toes." (*Id.*) He complained that "you guys treat it with antibiotics and then [the] redness and purple discoloration goes away" and the wound site "eventually heals but then the process starts again." (*Id.*) He stated, "I'm scared I'll eventually lose my foot due to infection." (*Id.*) It was noted that Dr. Marthakis was "aware of patient's current wound site with orders to continue with current wound care and for patient to remain non-weight bearing to L foot per orders." (*Id.*)

On November 8, 2018, Mr. Deane was seen for wound care and the nurse noted a small amount of drainage and "surrounding yellow calloused tissue" at the wound site. (*Id.* at 51.) The dressing was changed and antibiotic ointment applied. (*Id.*) It was noted that Mr. Deane had tried to obtain some wider shoes, but a prison staff member had informed Dr. Marthakis and the nurse by email that no wider shoes were available. (*Id.*) She noted that the shoes he was wearing had a "large bulge in L later aspect of shoe at

the site of current wound." (*Id.* at 52.) On November 9, 2018, he was seen again for wound care and the nurse noted that a "small opening still remains" in the wound area with some drainage. (*Id.* at 54.) He was witnessed using the crutches as he left the medical unit. (*Id.*) On November 10, 2018, he was seen again and the nurse noted the site was "without change" and there was still a "small opening" with drainage at the site. (*Id.* at 57.) He was again witnessed using the crutches as he left. (*Id.*)

On November 11, 2018, Mr. Deane was seen again by the nurse but she did not change his dressing because he had just changed it himself. (*Id.* at 59.) She gave him additional dressing and tape so that he could continue to change the dressing himself. (*Id.*) The following day, the nurse noted that the wound had a moderate amount of drainage and was "beefy red with yellow tinged callous[.]" (*Id.* at 61.) She changed the dressing and observed him using crutches as he left. (*Id.*) On November 15, 2018, the nurse changed his bandage and noted a small amount of drainage. (*Id.* at 64.) Mr. Deane reported to her that the wound "feels like something sticking him . . . like a needle." (*Id.*) The nurse's report was electronically signed by Dr. Marthakis. (*Id.* at 66.)

On November 16, 2018, and November 19, 2018, Mr. Deane was seen by the nurse for wound care and she again noted drainage at the wound site. (*Id.* at 68-70.) She gave him gauze, tape, and antibiotic ointment so he could change the dressing himself. (*Id.* at 68.) As of November 19, his order for crutches and "lay in" from work ended; the crutches and lay-in pass were extended for two weeks "due to non-healing wound." (*Id.* at 70.) On November 20, 2018, he was seen for wound care and the nurse noted that his dressing was "dry [and] intact." (*Id.* at 73.) On November 21, 2018, the nurse noted

7

drainage at the wound site and gave him additional supplies for "self care for site." (*Id.* at 76.) He was seen again on November 23, 2018, and his bandage changed. (*Id.* at 80.)

On November 28, 2018, Dr. Marthakis saw Mr. Deane for a follow-up regarding his foot. (*Id.* at 81-83.) He reported that the callous was aggravated by ill-fitting shoes that caused constant friction or rubbing on the callous, which would then lead to blistering or an open sore. (*Id.* at 81.) Dr. Marthakis inspected his foot and noted some drainage on the bandage but concluded that the wound was "improving." (*Id.* at 82.) She ordered that he continue with wound care, and also wrote an order for "custom shoes," as "IDOC has no proper fitting shoes to offer him." (*Id.*) She also continued the order for crutches. (*Id.*)

On November 29, 2018, and November 30, 2018, he was seen for wound care and it was noted that the wound was healing, although there was still some drainage. (*Id.* at 87-88.) Also on November 30, 2018, he was measured for "orthotic shoes." (*Id.* at 89.) On December 3, 2018, he was seen for wound care and the nurse noted a "scant" amount of drainage on his bandage. (*Id.* at 91.) The order for crutches expired and so Mr. Deane returned them. (*Id.* at 92.) He was able to walk from the medical unit without assistance. (*Id.*) The following day he was seen again, and the nurse noted scant drainage again on the dressing. (*Id.* at 94.) He was still waiting for his orthotic shoes even though the doctor had approved them. (*Id.*)

On December 5, 2018, Mr. Deane was seen for wound care and the nurse noted that he was still awaiting orthotic shoes. (*Id.* at 98.) No abnormalities were noted. (*Id.*) The following day, the nurse noted a "scant" amount of drainage on the bandage. (*Id.* at

100.) It was noted that he was "awaiting orthotic shoes per MD decision re: Hanger or shelf orthotics." (*Id.* at 101.) On December 7, 2018, the nurse noted that the wound was "healing well," but there was still a small amount of drainage. (*Id.* at 103.) She changed his dressing and gave him additional bandages and other supplies. (*Id.*) He was able to leave the unit without assistance. (*Id.*) On December 10, 2018, and December 11, 2018, it was noted that the wound was "clean and dry" and "healing well." (*Id.* at 106, 109.) On December 12, 2018, and December 13, 2018, the nurse noted some drainage at the wound site. (*Id.* at 112, 115.) She noted that he was still "awaiting orthotic shoes." (*Id.* at 113.)

On January 4, 2019, Mr. Deane saw Dr. Marthakis for a chronic care visit. (*Id.* at 1.) He reported that he was still "getting daily local wound care for left foot/toe callous" and that his "special/custom shoes [were] on order." (*Id.*) She ordered additional x-rays of his foot. (*Id.* at 3.) On January 9, 2019, Mr. Deane was provided with a pair of "diabetic shoes off shelf," size 13 wide. (*Id.* at 4.) On January 17, 2019, Dr. Marthakis had a follow-up appointment with Mr. Deane regarding his foot, and he reported that it was not improving much and that he was still "in pain." (*Id.* at 6.) He reported seeing "streaks of red going up his foot from the wound site" and expressed concerns about "losing his toe." (*Id.*) Dr. Marthakis examined his foot and noted an "open wound," and indicated that she would "request consultation with podiatry." (*Id.* at 7.) The following day he was seen by the nurse for wound care, and she noted "red streaks x 21 run on top of foot from redness at L 5th metatarsal and continue mid shin in single streak of redness." (*Id.* at 9.) She gave him tape and antibiotic ointment to use

for self-care of the wound. (*Id.*) She noted that he was "awaiting approval for podiatry visit re: non-healing wound L 5th toe with taylors bunion, valgus [sic], degenerative changes and osseous bridging between 4th & 5th metatarsal." (*Id.* at 10.) On January 25, 2019, Dr. Marthakis re-ordered the x-rays. (*Id.* at 12.)

Recall that we are now over a year into this tale and it is only at this point in the story that Dr. Marthakis consulted with her superiors; she called Wexford's Regional Medical Director, Dr. Michael Mitcheff, about Mr. Deane's foot. Dr. Mitcheff requested repeat X-rays, as well as photographs of the injury which was then ordered by Dr. Marthakis. (ECF 141-2 ¶ 19.) In February 2019, Dr. Marthakis had another conversation with Dr. Mitcheff regarding whether a podiatry consult was warranted. (*Id.* ¶ 21.) At that time, despite the fact that Mr. Deane had been enduring this condition for well over a year, Dr. Mitcheff nonetheless recommended that Dr. Marthakis continue to treat him at the facility. (*Id.*) Dr. Mitcheff's recommendation was that Mr. Deane continue with local wound care, and that a periodic "debridement" procedure be performed to remove tissue around the bunion, with an order for non-weightbearing and a change in medication. (*Id.*) Dr. Mitcheff and Dr. Marthakis also discussed that Mr. Deane be moved to an alternative housing unit where his meals and medications would be delivered to him. (*Id.*)

On February 25, 2019, Dr. Marthakis met with Mr. Deane and advised him that she had come up with a "podiatry consultation alternative plan." (ECF 141-4 at 13.) She told him that her plan was to continue with wound care and perform periodic "sharp debridement" of the area, and that he would not wear a left shoe until the area had

completely healed. (*Id.*) She advised him that he "may need G Dorm to promote [non-weight bearing]/offloading." (*Id.*) G Dorm is a housing unit directly above the health care unit, where Mr. Deane's medications and meals would be delivered to him. (ECF 141-2 ¶ 22.) Mr. Deane was unhappy with this plan. (ECF 141-3 at 48.) He did not want to be moved to G Dorm because it's a "hell hole" and "filthy dirty." (*Id.* at 49.) He claims that moving inmates to G Dorm is "known to be used as a deterrent for complaints." (*Id.*)

Mr. Deane's position was that the debridement would not help him because "debridement only affects the outside of your foot," whereas he had a structural problem relating to the bones in his foot. (*Id.* at 50.) Mr. Deane wasn't just playing doctor. As he stated in his deposition, he had several conversations with a retired podiatrist, Steven Grandfield, who volunteered during church services at the prison. (*Id.* at 24-27.) He claims that after examining his foot, this doctor told him that he needed a "simple surgery" to correct the issue to the metatarsal bone that would resolve the recurring infections. (*Id.* at 27.) Mr. Deane has not submitted an affidavit or other evidence from the podiatrist, and Mr. Deane's account of what the podiatrist told him is hearsay. *Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir. 2017). Nevertheless, Mr. Deane may be able to present evidence from the podiatrist in a form that would be admissible at trial. *See* FED. R. CIV. P. 56(c)(2)-(3); *Steffek v. Client Servs., Inc.*, 948 F.3d 761, 769 (7th Cir. 2020).

At the February 25, 2019 visit, Dr. Marthakis told him he had a right to refuse treatment, and provided him with a refusal of medical attention form. (ECF 141-4 at 15.)

At this point, over a year into the saga, things started to go sideways. The form stated that Mr. Deane "was offered the alternative plan of pressure offloading crutches and period debridement and G-dorm," but that he refused. (*Id.*) In the section Mr. Deane completed, he stated, "Debridement is unnecessary and I feel it will do harm and only effect symptoms not cause. I have not refused crutches they were taken. A federal injunction will be filed to stop medical procedures and a 1983 civil action will be filed." (*Id.*) Dr. Marthakis responded to Mr. Deane's refusal by discontinuing the order for wound care "on the spot" and confiscating his crutches.  (*Id.* at 17-19; ECF 141-2 ¶ 24; ECF 141-3 at 54.) The form Mr. Deane signed refusing treatment did not indicate that he was refusing wound care or crutches. (ECF 141-4 at 15.)

Three months went by without Mr. Deane receiving any care. According to the medical records, Mr. Deane was next seen by a nurse on May 9, 2019, and reported that he had "a wound on [his] foot for 4 years." (ECF 141-4 at 22.) She noted some discoloration of his foot but no sign of active infection. (*Id.* at 23.) She noted a "dime sized closed wound on the left side of his foot." (*Id.*) He asked for supplies so that he could keep the area bandaged, but she told him that "it needed to be done here in [the] nurse's station." (*Id.*) Mr. Deane left the area without any supplies, but later had a sergeant call over to try to get him some bandages. (*Id.*) The nurse told the sergeant that Mr. Deane "needed to be observed" in the nurse's station. (*Id.*)

Dr. Marthakis next saw Mr. Deane on May 29, 2019, for a chronic care visit. (*Id.* at 123.) He reported that the wound was "occurring intermittently" but was presently "healed over." (*Id.*) She told him to "obtain commissary corn/callous pads" and gave

him a dose of Tylenol and "a few band aids." (*Id.* at 125.) Mr. Deane was not able to

purchase corn/callous pads from the commissary because he is indigent. (ECF 141-3 at

32-33, 57.)

On August 9, 2019, Dr. Marthakis saw Mr. Deane after he indicated that he "just

wanted to talk." (ECF 141-4 at 120.) He reported that his callous had "opened up again"

into another wound. (*Id.*) Dr. Marthakis again told him of the "alternative plan," which

was to conduct "local sharp debridement" and move him to G Dorm. (*Id.*) Mr. Deane

again declined this course of treatment and expressed his view that Dr. Marthakis was

trying to "punish" him by moving him to G Dorm. (*Id.*)

At his deposition conducted on February 18, 2020, Mr. Deane testified that the

wound was starting to recur. (ECF 141-3 at 59.) He testified that "[b]lood is underneath

there. . . . [i]t is very evident." (*Id.* at 59.) He stated that the area had "more than

discoloration. . . It's all dried and hurts." (*Id.* at 67.) Mr. Deane offered to show the

wound to defense counsel, but she (perhaps understandably) demurred. (*Id.*) In

summary, Mr. Deane succinctly described the problem:

> [T]his recurring wound has been going on for four years, and the problem
> is inside my foot . . . Dr. Marthakis seems to think that it's from rubbing
> the shoes and stuff. It's not. I have a dropped fifth metatarsal that—when I
> walk, pressure is being exerted. It creates blood and fluid, and the
> pressure squeezes that blood and fluid up into a callus bunion area. It
> eventually erupts into a wound. It heals every time after it erupts, but it
> comes right back . . . . It's just a constant recurrence.

(ECF 141-3 at 24.) He testified that he still intermittently needed crutches because "this

wound keeps reoccurring," but Dr. Marthakis had confiscated them. (*Id.* at 30.) He

further testified, "I need proper shoes. I don't have proper shoes." (*Id.*) He explained

that the shoes they gave him were "too hard. . . they're not doing a bit of good" because "[t]here is no padding . . . it just makes the pressure that much worse[.]" (*Id.* at 30, 45.) He testified, "this thing hurts every day." (*Id.* at 45.)

He further testified that he needed bandages when the sore opened up and that he could not "wait . . . for a week when I put in a medical slip. . . . It's open. I'm susceptible to infections." (*Id.* at 30.) He stated that he currently had "red streaks running up my feet that's never went away." (*Id.*) He testified that he wants wound care, and has made written requests to be put back on wound care, but "Dr. Marthakis won't allow me into wound care." (ECF 141-3 at 37.) When he has gone to the medical unit to ask for bandages "[t]hey won't give them to me." (*Id.* at 55.) He claims Dr. Marthakis told him, "You're going to quit coming over here and demanding stuff." (*Id.*) In his words, "All I did is put in a request to ask for them. I wasn't demanding anything." (*Id.*) He has on occasion since 2019 received bandages from nursing staff, but "sometimes they weren't enough or what I actually needed." (*Id.*) He explained that even when "there is not an actual wound there, I still need bandages to pad it." (*Id.* at 61.) He has tried using toilet paper to pad the area but it "falls apart" and will not stay in place. (*Id.* at 62.)

He further testified that of the many visits where he saw Dr. Marthakis for his foot problem, she only physically examined his foot once, and she usually "wouldn't even have me take my shoe off." (*Id.* at 58.) He claims that the one time she did look at his foot, she did not intend to look at it, but he asked her to examine it and she responded, "Well, I suppose." (*Id.* at 58.) He testified that after he declined the

debridement procedure, Dr. Marthakis "had me removed from her office three times." (*Id.*) A few days prior to the deposition, he had a chronic care visit with Nurse Practitioner Thews and tried to talk with her about his foot, but "[i]t didn't go very far . . . . She said I wasn't there for that." (*Id.* at 63-64.) He asked for some medical tape so he could keep the area bandaged but she told him they didn't have any and that she "was finished." (*Id.* at 64.) He testified that he had recently put in at least three health care slips asking for care for his foot. (*Id.* at 68.) He is concerned that after "eight infections. . . I could lose a foot over this[.]" (*Id.* at 74.)

During much of this period, Mr. Deane worked a job at the prison that involved cleaning and other activities requiring him to be on his feet. In his words, he worked this job because he "had to get hygiene." (ECF 141-3 at 59.) He explained that all deposits to his inmate trust account were taken to pay a restitution order, other than $10 per month which he was allowed to use to purchase soap and other hygiene items. (*Id.* at 32-33.) If he could not pay for these items he would be given an "indigent kit," but in his view this was not sufficient to keep clean because "you get a little square bar of soap . . . for a whole month. . . You're lucky if it lasts two weeks." (*Id.* at 59-60.) He acknowledged that he was able to walk to his deposition, but added, "I'm not saying that there's not pain there . . . because it is." (*Id.* at 62.)

## Discussion

Under Federal Rule of Civil Procedure 56, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A

genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018) (citation omitted). In deciding whether a genuine dispute of fact exists, the court must "consider all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (citation omitted). At the summary judgment stage, the court cannot "weigh conflicting evidence," or "make credibility determinations," as both of these functions "are the province of the jury." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011) (citations omitted). Instead, the court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (citation omitted).

Under the Eighth Amendment, prisoners are entitled to adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Establishing an Eighth Amendment violation "requires a two-fold showing." *Murphy v. Wexford Health Sources, Inc.*, 962 F.3d 911, 915 (7th Cir. 2020). "First, the plaintiff must suffer from an objectively serious medical condition." *Id.* (citation and internal quotation marks omitted). "[S]econd, the plaintiff must provide evidence that the defendant *actually* knew of and disregarded a substantial risk of harm." *Id.* (citation and internal quotation marks omitted).

Inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Mere disagreement with a

16

medical professional does not establish an Eighth Amendment violation. *See Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003). Courts generally "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citation and internal quotation marks omitted).

At the same time, a prisoner is not required to show that he was "literally ignored" to establish deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) "[T]he rendering of *some* medical care does not necessarily disprove deliberate indifference; the treatment rendered may be so blatantly inappropriate that it can support an inference of intentional mistreatment." *Cesal v. Moats*, 851 F.3d 714, 723 (7th Cir. 2017). For example, "inexplicable delay in responding to an inmate's serious medical condition can reflect deliberate indifference," particularly where "that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citations and internal quotation marks omitted); *Machicote v. Roethlisberger*, 969 F.3d 822, 827 (7th Cir. 2020) (observing that delaying treatment "for hours of needless suffering can be sufficient for a jury to infer deliberate indifference"). Additionally, a "prison physician cannot simply continue with a course of treatment that he knows is ineffective in treating the inmate's condition." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). Thus, "a doctor's choice of the easier and less efficacious treatment for an objectively serious medical condition" can amount to deliberate indifference. *Berry*, 604 F.3d at 441.

In support of her motion for summary judgment, Dr. Marthakis argues that "[n]o rational juror could find deliberate indifference on this record." (ECF 141 at 19.) In her view, the record shows that Mr. Deane "received thorough wound care. His wound healed. He received pain medication," as well as "special ordered custom medical shoes," x-rays, and other treatment. (*Id.* at 18-19.) Further, he was offered a "comprehensive treatment plan to assist with improved healing to the affected area, but the Plaintiff refused on multiple occasions." (*Id.* at 19.) She further argues that the fact that Mr. Deane could walk to his deposition and worked a prison job during this period shows that his "condition did not prohibit him from . . . being on his feet every day." (*Id.*) Warden Neal argues that Mr. Dean's "claim for injunctive relief . . . fails for the same reason." (ECF 143 at 1.) In his view, "Plaintiff received extensive medical treatment" for the recurring wound on his left foot and no further treatment is warranted. (*Id.* at 1-2.) Mr. Deane, on the other hand, argues that there are numerous fact disputes precluding summary judgment, including whether Dr. Marthakis has denied him bandages, crutches, and wound care when he needs them, whether he has been given adequate shoes to address his foot problem, and whether Dr. Marthakis is adequately treating the underlying problem with his foot. (ECF 147; ECF 148.)

I agree with Mr. Deane. There are plainly questions of fact in this case that only a jury can resolve. Accepting, as I must, Mr. Deane's account as true and construing all inferences in his favor, there is evidence that he has a severe bone deformity and other structural anomalies in his foot. (ECF 141-2 ¶¶ 5-7.) Because of this condition, he has suffered numerous open wounds and infections that have taken a long time to heal and

required multiple rounds of antibiotics. (ECF 141-4 at 24-113.) It is true that Mr. Deane has received an abundance of treatment for his wound. But a reasonable jury could readily conclude that the wound is simply the manifestation of a more fundamental problem which is being ignored by the prison officials. Indeed, as of the date of his deposition in early 2020, the wound was festering again, he was still in pain, and he had "red lines" radiating from his foot up his leg. (ECF 141-3 at 24, 59-67.)

Although Dr. Marthakis argues that Mr. Deane was given "special" shoes to address his condition, the record reflects that he was supposed to receive custom "orthotic" shoes, but after waiting more than a month, he was given off the shelf "diabetic" shoes instead. (ECF 141-4 at 4.) He attests that these shoes are too hard, have no padding, and are only exacerbating his condition. (ECF 141-3 at 30, 45.) In addition, several products Dr. Marthakis told him to buy at the commissary to help alleviate his pain—such as corn pads and gel insoles— he cannot purchase because he is indigent. (*Id.* at 57.)

The record also shows that for many months Mr. Deane fully complied with the doctor's treatment recommendations, using crutches to stay off his foot, reporting for regular wound care, and often changing the bandages on his own when he was given proper supplies. (ECF 141-4 at 24-113.) The record shows that Dr. Marthakis intended to send him to a podiatrist for this "non healing wound," but abruptly changed courses after speaking with the Regional Medical Director. It is true that the Eighth Amendment does not allow Mr. Deane to pick which treatment he wants. *Walker*, 940 F.3d at 965. But construing the record in his favor, he had valid reasons for not wanting to pursue the

19

"debridement" plan, including that it would be painful and, in his view, unlikely to resolve the structural problem with his foot. It would also require him to be transferred to a part of the prison he describes as a "hell hole." (ECF 141-3 at 49.) He attests, and the court must accept as true at this stage, that inmates are often moved to G Dorm to stop them from complaining about their medical problems. (*Id.*)

The record also contains evidence that since the time Mr. Deane declined to go along with the "debridement" treatment plan, Dr. Marthakis has refused to provide even minimal treatment for his foot, such as bandages and tape so that he can adequately pad the area, and crutches and wound care when he needs them. (*Id.* at 58-62.) A reasonable juror could conclude that there was no valid medical reason to abruptly discontinue his wound care and confiscate his crutches after he declined to accept her treatment recommendations. Mr. Deane did not expressly refuse this form of treatment, and he testified at his deposition that he still needs them. There is also no evidence in the record to show that Dr. Marthakis (or anyone else) is monitoring his current condition, even though the wound was festering again by the time of his deposition earlier this year. (ECF 141-3 at 24, 59.)

Although Mr. Deane was able to work at a prison job during part of this period and admits he is capable of walking without assistance, the record is replete with his complaints that his foot condition has been causing him significant pain for years. (ECF 141-3 at 67; ECF 141-4 at 6, 28, 30, 64.) The Eighth Amendment does not require him to become completely immobilized before he can obtain treatment. Based on the record, summary judgment is plainly not appropriate. *See Machicote*, 969 F.3d at 827 (reversing

summary judgment for nurse where evidence showed that she prolonged the plaintiff's pain without adequate medical justification); *Rivera v. Gupta*, 836 F.3d 839, 842 (7th Cir. 2016) (reversing summary judgment for prison doctor because "[a] reasonable jury might well infer that personal hostility, divorced from medical judgment, had motivated [the doctor's] refusal to provide [the prisoner] with any further treatment[.]"); *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011) (observing that the prisoner can "prevail if the defendants' response to more than two years of complaints has been blatantly inappropriate in the face of his pain and the risk the worsening [condition] poses to his present and future health").

## Conclusion

For these reasons, Warden Neal's motions to join in Dr. Marthakis's summary judgment filings (ECF 143, 152) are GRANTED. The motion for summary judgment (ECF 140) is DENIED.

SO ORDERED.

ENTERED:  September 25, 2020.

 /s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT